UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACCURATE GRADING QUALITY ASSURANCE, INC.; ELECTRONIC SALES DEALERSHIP NETWORK, INC.; THE DIAMOND CENTER, INC.; and STEVE YEKO, | Civil Action No.: 12-cv-9130 (LTS) (RLE) |
| Plaintiffs, | **AMENDED COMPLAINT** |
| v. | |
| SANJAY KHOTHARI; KGK JEWELRY LLC; KGK GROUP; ALLEN BLOOM; JOHN THORPE, MARTIN FLYER JEWELRY LLC; KNUD HOSTRUP; JOSH KAUFMAN; SUSAN HECHT; and PRADEEP SAHOO, | Jury Trial Requested ECF Case |
| Defendants. | |

Plaintiffs Accurate Grading Quality Assurance, Inc. ("aGQa"), Electronic Sales

Dealership Network, Inc. ("ESDN"), The Diamond Center, Inc. ("The Diamond Center"), and

Steve Yeko ("Yeko"), by the undersigned, as and for their Complaint against Sanjay Khothari

("Khothari"), KGK Jewelry LLC ("KGK NYC"), KGK Group ("KGK GLOBAL"), Allen

Bloom ("Bloom"), John Thorpe ("Thorpe"), Martin Flyer Jewelry LLC ("Martin Flyer"), Knud

Hostrup ("Hostrup"), Josh Kaufman ("Kaufman"), Susan Hecht ("Hecht"), and Pradeep Sahoo

("Sahoo"), allege as follows:

## SUMMARY

1.       This action arises from the Defendants' individual and concerted efforts to

unlawfully undermine Plaintiffs' respective businesses and reputations through a series of frauds,

fraudulent inducements, breaches of contract, interference with business relationships,

misappropriation of intellectual property, and defamation.

2.       Starting in or around 2009 and continuing through the early part of 2012, the

Plaintiffs were engaged, with one or more of the Defendants and in varying degrees of

involvement, in developing, marketing, selling, executing and maintaining a comprehensive marketing and e-commerce platform for jewelry store retailers (the "E-Commerce Platform").

3.     The E-Commerce Platform was intended and designed to provide jewelry store retailers with a wide variety of marketing and promotional tools, as well as the ability to carry lines of jewelry "virtually," thereby expanding sales while significantly reducing overhead and carrying costs.

4.     For example, one of the most tangible elements of the E-Commerce Platform was an in-store kiosk that consisted of a touch-screen computer that customers could use to browse virtual merchandise and enter their contact information to receive email updates and promotions and to enter into a sweepstakes that offered monthly $1,000.00 jewelry prizes.  The contact information collected at the kiosks could and was then be used for promotional and marketing purposes.

5.     Several of the Defendants, including KGK NY, KGK Global, Bloom, and Khothari (collectively, the "KGK Defendants"), induced the corporate Plaintiffs to enter into various agreements and, in accord with those agreements, expend a tremendous amount of financial and other resources, with the KGK Defendants knowing that they never intended to honor their respective commitments.

6.     After fraudulently inducing the corporate Plaintiffs to enter into these agreements, the KGK Defendants, as well as Sahoo and Hostrup, further fraudulently induced the corporate Plaintiffs to continue performing their obligations and otherwise committing considerable resources by knowingly making false statements regarding the KGK Defendants' capabilities and intentions.

7.     The KGK Defendants then proceeded to breach and otherwise defeat the purpose of the parties' various agreements in every conceivable way, including:

- failing to pay money owed to Plaintiffs
- intentionally and fraudulently engaging in systematic "grade bumping" of the diamonds sold to the retailers participating in the E-Commerce Platform program, including The Diamond Center, which resulted in a doubling of the fair and accurate price for such merchandise
- promising to provide services and support to the parties' mutual clients that they knew they could not timely deliver, and then failing to deliver
- failing to provide informational and other support to Plaintiffs
- failing to provide administrative and other back-office support through KGK NY's New York and Hong Kong offices, and refusing to properly and lawfully compensate KGK NY's New York employees, including by paying some employees in cash rather than through proper payroll procedures
- failing to provide sales and other marketing support to generate new clients, including refusing to pay the sales force as contractually agreed
- overcharging retailers for merchandise
- failing to provide merchandise and services as agreed
- undermining Plaintiffs' reputation with the parties' mutual clients, including by making knowingly false statements about Plaintiffs directly and through the sales force
- deliberately interfering with the corporate Plaintiffs' contracts with the parties' mutual clients
- undermining the Plaintiffs' reputations in the jewelry industry at large, including by making knowingly false statements about the Plaintiffs
- unlawfully cutting the corporate Plaintiffs off from their own computer hardware and customers
- misappropriating the Plaintiffs' trade secrets and copyrighted works.

8.     As a result of the Defendants' actions, the Plaintiffs have been damaged and have been exposed to potential liability in an amount well into the millions of dollars, including:

- unpaid invoices in an amount over $300,000.00
- non-payment for creating and administering the sweepstakes offer provided to the parties' mutual clients through retail kiosks
- non-payment for the corporate Plaintiffs' out-of-pocket software development costs of approximately $2,000,000.00

- several million dollars of lost profits reasonably expected in connection with the parties' mutual efforts to sell and service the E-commerce Platform to and for jewelry retailers

- several million dollars of lost profits reasonably expected in connection with other opportunities to exploit the technology, know-how, and business foundation that would have been developed but for the Defendants' unlawful acts and omissions

- approximately $1,500,000.00 to $3,000,000.00 associated with potential liability and damage to aGQa's business reputation as a result of Defendants Bloom and KGK NY's knowing, intentional, systematic, and fraudulent scheme of diamond grade inflation, or "bumping," on virtually all of the merchandise KGK NY and/or KGK Global supplied to the jewelry store retailers in connection with the initial deployment of the E-Commerce Platform to the 70 retail jewelry stores that signed up as ongoing members, including The Diamond Center

9.      In addition to upwards of  10,000,000.00 in compensatory damages, the

Defendants' concerted and unlawful actions were knowing and deliberate, and should be met

with punitive damages to deter them from continuing their highly unethical and dishonest

business practices in the future.

## PARTIES, JURISDICTION AND VENUE

10.      Plaintiff Accurate Grading Quality Assurance, Inc. is a software, technology and

marketing company incorporated and existing under the laws of Wisconsin, with a principal

place of business of 2500 Milton Avenue, Janesville, WI 53546.

11.      Plaintiff Electronic Sales Dealership Network, Inc. is a marketing company

incorporated and existing under the laws of Wisconsin, with a principal place of business of 2500

Milton Avenue, Janesville, WI 53546.

12.      Plaintiff The Diamond Center, Inc. is a retail jewelry company incorporated and

existing under the laws of Wisconsin, with a principal place of business of 2500 Milton Avenue,

Janesville, WI 53546.

13.      Plaintiff Steve Yeko is an individual residing in Janesville, Wisconsin.

14.      Defendant Sanjay Khothari is an Indian citizen residing in India who is in charge

of KGK Global's New York operations and, specifically, KGK NY, and who frequently travels

to New York to conduct the business of KGK Global and KGK NY, including much of the

conduct that gives rise to the Plaintiffs' claims set forth herein.

15.     Defendant KGK Jewelry LLC ("KGK NY") is a New York Limited Liability

Company comprised of the following five Members:

> a.      Vinamra Kothari, who is domiciled in the State of New Jersey;
>
> b.      KGK Holding Inc., a corporation organized under the laws of New York, with its principal place of business located at 70 West 36th Street, 6th Floor, New York, NY 10018;
>
> c.      KGK Properties USA Inc., a corporation organized under the laws of New York, with its principal place of business located at 70 West 36th Street, 6th Floor, New York, NY 10018;
>
> d.      KGK Creations USA Inc ., a corporation organized under the laws of New York, with its principal place of business located at 70 West 36th Street, 6th Floor, New York, NY 10018; and
>
> e.      Unique Holding (US) Inc., a corporation organized under the laws of Delaware, with its principal place of business located at 36 West 44th Street, 13th Floor, New York, NY 10036.

16.     Defendant KGK Group ("KGK Global") is a multinational corporation or similar

collective entity that is headquartered in Mumbai, India, with significant operations, itself and/or

through subsidiaries, also in Hong Kong and New York.

17.     Defendant Allen Bloom is an individual residing in New Jersey at 166 Micki

Drive, Morganville, NJ 07751, who was a full-time employee of and of KGK NY who, based on his

own statements to the Plaintiffs, was entitled to 50% of the profits of KGK NY, and who

conducted a substantial part of his duties on behalf of KGK NY in New York.

18.     Defendant John R. Thorpe is an attorney admitted to practice law in Wisconsin

(currently inactive) and residing in Missouri at 900 Leland Ridge Road, Columbia, MO 65203.

19.     Defendant Martin Flyer Jewelry LLC ("Martin Flyer") is a limited liability

company organized and existing under the laws of New York, with a principal place of business

of 70 West 36th St. #602, New York, NY 10018.  On information and belief, Martin Flyer is now fully owned by KGK NY or KGK Global.

20.     Defendant Knud Hostrup is, on information and belief, a full-time employee of KGK NY, Martin Flyer, or both, and performs a substantial part of his duties at each or both companies' offices in New York.

21.     Defendant Josh Kaufman is, on information and belief, a full-time employee of Martin Flyer who conducts a substantial part of his duties at Martin Flyer's New York office listed above.

22.     Defendant Susan Hecht is, on information and belief, a full-time employee of KGK NY who conducts a substantial part of her duties at KGK NY's New York office listed above.

23.     On information and belief, Defendant Pradeep Sahoo is, or was during all or most of the period relevant to the Plaintiffs' claims herein, a full-time employee of KGK NY, KGK Global, or both, and performs or performed a substantial part of his duties at each or both companies' offices in New York.

24.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Plaintiffs are all residents and citizens of Wisconsin, none of the Defendants are residents or citizens of Wisconsin, and the amount in controversy is in the millions of dollars.

25.     Venue is proper in this District under 28 U.S.C. §§ 1391(a), as a substantial part of the events giving rise to this action occurred in this District, and Defendants may be found in this District.

## FACTUAL BACKGROUND

26.     Steve Yeko, the founder and leader of The Diamond Center, aGQa and ESDN, has been in the retail jewelry business for more than thirty years, and has developed a reputation of honesty, integrity, and sharp business acumen.

27.     During the mid-2000s, Steve Yeko began to see an opportunity to develop software and other marketing products to bring the jewelry industry into the information age, and formed aGQa for that purpose.

28.     Yeko then built aGQa into one of the first patented processes for certifying diamond grades "virtually," which allowed approved jewelers to issue certifications for individual pieces of jewelry that included industry standard grading information, and built aGQa into one of the leading software and marketing companies serving the jewelry industry through his own ingenuity, sweat equity and substantial financial investment.

29.     Yeko then spent approximately two years developing the precursor to the E-Commerce Platform, and launched it via ESDN, which was initially called ESDN-Live, after establishing several non-exclusive partnerships with well-known jewelry brands.

30.     Bloom, on behalf of KGK NY, initially began doing business with aGQa in connection with aGQa certification cards.

31.     Yeko then began discussing a collaboration with KGK NY and/or KGK Global through Bloom and one of KGK NY's other key employees, Defendant Pradeep Bubna.  At that time, KGK had no retail presence other than as a provider of generic jewelry to other companies that would then sell the jewelry under their own brand(s), such as Le Vian, Jared, and Kay Jewelers.

32.     The parties discussed an arrangement whereby they could offer jewelry store retailers a comprehensive e-commerce package that would allow those jewelry stores to reach many new customers, establish stronger loyalty with their existing customers, and offer a greatly expanded array of merchandise that could be branded by each individual retailer, all for very little additional cost. The platform also included the requirement that all merchandise sold through the program would be issued an aGQa certification, for a small additional cost per item.

33.     The two groups envisioned dividing the work according to their own individual strengths. Given the head start that Yeko and aGQa already had in the e-commerce market, and Yeko's decades of experience, wide contacts, and excellent reputation in the jewelry retail industry, Yeko, aGQa, and the newly formed ESDN would oversee and direct the continued development of the required software and other technical aspects of the planned offering, including development of the look and feel of the product and its marketing components, and would give KGK the exclusive right to market and participate in the E-Commerce Platform within their product category.

34.     Given KGK's strong position in the generic/wholesale jewelry supply business, and enormous financial resources, KGK would be the main provider of the generic jewelry that each jewelry retailer could self-brand, would fund the software and other product development that Yeko, aGQa and ESDN would run, and would engage the sales force necessary to promote the E-Commerce Platform to individual retailers. KGK was also responsible for providing sufficient information and support to aGQa and ESDN for them to begin hosting and offering for sale as part of the E-Commerce Platform a "virtual catalog" of all KGK generic merchandise that KGK elected to include.

35.    The parties agreed to those essential terms in early 2010, and both proceeded to begin to perform their respective obligations accordingly.  From the beginning, Yeko always made it clear to Bloom and Khothari that the E-Commerce Platform, and even just the virtual catalog, were large undertakings and that they would require significant funding from KGK NY, and from the beginning Bloom and Khothari acknowledged these costs and assured Yeko that they would be paid by KGK NY.

36.    The two groups introduced a concept/prototype version of the marketing platform at the July 2010 JCK trade show in Las Vegas, which is one of the largest and most broadly attended shows in the industry.  In its press release at the time, KGK described aGQa's and ESDN's integrated program as the "newest and most comprehensive," "unique," and "highly effective," stated that it gave its jewelry retailer users "a decisive competitive edge," and acknowledged that ESDN was "the industry's fastest-growing secure source for highly effective jewelry e-commerce solutions."  On information and belief, KGK told one or more members of the press that it had "partnered with" ESDN to offer the E-Commerce Platform, and that it had "exclusive rights" to the "custom e-marketing software."

37.    Throughout the course of their working relationship, continued to keep KGK NY informed that the scope of the development costs, for which KGK was contractually responsible, were running between $150,000.00 - $250,000.00 per month, and sometimes higher, and that they could be expected to continue at that level for some time.

38.    During a meeting in Hong Kong in early 2011 attended by Steve Yeko, John Thorpe (then an aGQa employee), Allen Bloom, and Sanjay Khothari, Khothari reiterated on behalf of KGK NY that he understood the scope of the past and continuing development costs, that he understood it was KGK NY's obligation to pay for them, and that Yeko, aGQa, and

ESDN should continue with the development process with every expectation of being paid. Khothari further reiterated this commitment, including his understanding of its cost, later that year in Las Vegas at the JCK trade show.

39.    Khothari knew when he was making these statements that he had no intention of committing the required and contractually obligated resources, and made these false statements for the specific and intended purpose of inducing the corporate Plaintiffs to continue committing resources to the E-Commerce Platform project.

40.    Yeko, aGQa, and ESDN did so, and continued to outlay hundreds of thousands of dollars in connection with pushing the project forward and, ultimately, incurred millions of dollars in total development and other related costs.

41.    KGK NY, for its part, continued to engage a sales force of approximately 10-15 sales people spread across the country, and entered into contracts with 70 individual jewelry store retailers, including The Diamond Center, who in turn entered into separate contracts, with materially different scopes, subject matter and terms, with ESDN and aGQa.

42.    Almost as soon as the project began to gain momentum, however, KGK began to undermine it.

43.    In breach of the parties' contract, KGK failed to compensate aGQa and ESDN for the software development costs aGQa and ESDN incurred.

44.    KGK NY also promised in writing that they would provide 20 individual line items to the 70 jewelry store retailers, including The Diamond Center, but did not provide or cause to be provided most of those items to the retailers.

45.    KGK NY failed to provide usable data to aGQa and ESDN in connection with them creating the "virtual catalog" of KGK merchandise to be included in the E-Commerce

Platform, and failed to provide adequate technical and other support from KGK NY personnel to correct the problems with the KGK data, which greatly increased the costs of creating the KGK virtual catalog.

46.     KGK NY failed to provide any back-office or other support to the 70 retailers with whom they had entered into contracts, and the task of providing such support fell to aGQa and/or ESDN, and KGK has failed to compensate either for its expenditure of valuable resources.

47.     KGK NY failed to properly and lawfully compensate its New York employees, including by paying some in cash and failing to properly pay overtime wages, which added to the KGK NY staff's unwillingness to meaningfully participate in servicing the jewelry store retailer customers, which further added to aGQa's and ESDN's costs.

48.     KGK NY also failed to properly deploy or pay for the sweepstakes that was put on the in-store kiosks at ESDN's/aGQa's expense. In addition to the out-of-pocket costs associated with developing and getting legal clearance for the sweepstakes, KGK's failure further undermined the E-Commerce Platform project as a whole, especially given that the sweepstakes was the part of the E-Commerce Platform most visible to retail customers.

49.     Despite the rapid success the sales force had during the first six months or so of promoting the E-Commerce Platform in 2011, KGK NY undermined the sales effort by failing to deliver the merchandise that KGK NY required the retailer to buy as part of their contract. KGK NY also refused or failed to compensate the salespeople as agreed, and many or most of them in turn stopped promoting the E-Commerce Platform to their client base. In fact, many of the former KGK salespeople were forced to engage attorneys who threatened to sue KGK on their behalf, and only then did KGK offer to pay even half of what was contractually owed. KGK did not replace the sales force with any other method of promoting and marketing the E-Commerce

Platform in 2012, at which time ESDN was moving full speed ahead with meeting its obligations. KGK NY's abandonment at his crucial time essentially left the E-Commerce Platform for dead.

50.     In order to offset its own costs associated with financing the development, marketing and implementation of the E-Commerce Platform, KGK also overcharged the jewelry store retailers for the KGK generic merchandise that the retailers were required to buy and maintain in stock as part of their contract with KGK.

51.     As a result of the above, most if not all of the 70 retailers that KGK NY obtained as customers of KGK NY and aGQa and ESDN have cancelled or attempted to cancel their contract with KGK NY and have sent back most if not all of the KGK inventory they had left.

52.     KGK also put Defendant Bloom in charge of KGK's side of the E-Commerce Platform, despite knowing, but not telling Yeko, aGQa or ESDN, that prior to working for KGK, Bloom was convicted and served time in federal prison for, among other things, overstating the value of the jewelry inventory at a business that he partially owned in order to support a multi-million dollar credit line. Bloom's prior criminal scheme eventually cost the bank over $15,000,000.00 in losses.

53.     Bloom used the "second chance" KGK gave him to repeat virtually the same fraud on behalf of himself and KGK NY and/or KGK Global. KGK NY and/or KGK Global, through Bloom and possibly others, systematically and intentionally "bumped" up the grades of diamonds coming from its Hong Kong factories by one or more grades, resulting in the value of the diamonds being overstated by almost double. KGK and Bloom not only further overcharged the 70 retailers (including The Diamond Center) in this way, but they also put those known and intentionally false grades on the aGQa certification cards that went with them, thereby exposing

aGQa to millions of dollars of potential liability claims from those retailers and the insurer that underwrites the aGQa certification cards.

54.     In addition to violating the parties' agreement relating to the E-Commerce Platform, this unlawful and possibly criminal scheme was also a breach of the terms and conditions of the agreement every aGQa authorized party enters into with aGQa. Under that agreement, and consistent with its business practices, aGQa does not independently grade or oversee the grading of jewelry for which an aGQa certification card is generated. Rather, each aGQa authorized party promises and agrees to accurately grade, to the best of their ability and consistent with industry guidelines, each and every piece of jewelry that retailer certifies, or to accept a previously given grade in good faith. aGQa, in turn, agrees that if the grade the retailer gave to a particular piece of jewelry proves to be inaccurate within 90 days of purchase by the consumer, for any reason, aGQa will compensate the retail customer for their loss.

55.     Because of all of the above failures and breaches of the parties' agreements, the parties' business relationship fully deteriorated at the end of 2011, as it became clear to the Plaintiffs that KGK NY had no intention of meeting its various commitments.

56.     Through counsel, Steve Yeko and Sanjay Khothari agreed to meet in early 2012 when Khothari came to New York for the purpose of attempting to resolve their differences and come to an amicable settlement. While not denying that many of the amounts then owed were beyond dispute, and after Yeko and two of his associates had already traveled to New York, Khothari cancelled the meeting without explanation, except to explain through counsel that he had simply decided that he would not pay the Plaintiffs anything. This, along with further actions described below, show that Khothari never intended to follow through on the promises he made and obligations he took on, through his own words and deeds, on behalf of KGK NY.

57.     Not satisfied with torpedoing the E-Commerce Platform through both action and omission, and squandering the market dominant position that Yeko, aGQa and ESDN had spent years establishing and to which KGK insisted on exclusive rights, KGK began a campaign to undermine what remained of Yeko, aGQa and ESDN's opportunities to monetize the E-Commerce Platform, as well as their reputations in general.

58.     In or around December 2011, KGK NY hired John Thorpe, who only months before had been one of a handful of key employees of aGQa and confidantes of Steve Yeko, for the specific purpose of duplicating the in-store kiosk system over which Thorpe had overseen development at aGQa, and to help hack into the in-store kiosks that ESDN had paid for and set up at over 50 retail locations in order to replace them with a software system that KGK has admitted was far less robust. This was not only a flagrant breach of the parties' agreements, it served – and was intended to serve – to improperly pin the blame for KGK's myriad failures on Yeko, aGQa, and ESDN.

59.     In connection with this bold and lawless act, KGK NY and its employees, and related companies and their employees, began to explicitly and inaccurately cast blame on Yeko, aGQa and ESDN. For example, in an email letter to the 70 retailers, Josh Kaufman of Martin Flyer blamed ESDN for improper execution of the E-Commerce Platform, even though he knew about all or most of KGK NY's above-described failings, stated that ESDN had improperly cut Martin Flyer off from its customers, and indicated that they would be able to replace the ESDN system in 90 days, which he knew was not possible and which grossly understated the complexity and robustness of the E-Commerce Platform system. A short time later, Susan Hecht, under her own name but on behalf of KGK NY, sent a similar letter that accused Steve Yeko of lying and again attempted to place the blame for KGK NY's failings on Yeko, aGQa

and ESDN.

60.     Steve Yeko, aGQa and ESDN have also recently learned that Allen Bloom, Knud Hostrup, and other employees of KGK NY regularly and improperly placed the blame for KGK NY's shortcomings on Yeko, aGQa and ESDN, during much of the course of the parties' business relationship, when sales people and jewelry store retailers voiced complaints about the lack of progress in delivering on all of the promises in the contracts between KGK NY and the jewelry store retailers.

61.     Following in the same vein, KGK NY then, with full knowledge of Yeko's ownership interest, reported The Diamond Center to an industry publication as delinquent in paying for the jewelry that KGK NY sent The Diamond Center in connection with it being one of the 70 retailers participating in the E-Commerce Platform, in spite of the fact that KGK NY and other Defendants know that said jewelry was overpriced and fraudulently graded, and that The Diamond Center therefore has no obligation to pay for it.

62.     On information and belief, KGK NY, Allen Bloom, Knud Hostrup, Susan Hecht and other KGK NY employees continued to make knowingly false and disparaging remarks about the Plaintiffs throughout 2012, as complaints and threats of legal action rolled in from jewelry store retailers and former sales people.

63.     As a result of these actions, and as set forth above, the Plaintiffs have each and all suffered significant monetary damages, with the total being approximately $10,000,000.00. In addition, the Defendants' actions were concerted, intentional, knowing, and fraudulent, and appear to be ongoing and consistent with the Defendants' warped sense of how to conduct business. Simply awarding the Plaintiffs compensatory damages will not put the Defendants in any worse position than they would have been if they had simply honored their commitments,

and therefore will not provide any incentive to change their way of conducting themselves in the business community.  As such, the Defendants should be penalized with an award of punitive damages large enough to change their business calculus in the future, if not their moral compass.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

#### (ESDN against KGK NY)

64.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

65.     KGK NY and ESDN entered into a binding and lawful agreement whereby each agreed to take on certain aspects of the E-Commerce Platform in exchange for the other's performance and other valuable consideration.

66.     KGK NY breached this agreement numerous times, and continues to be in breach of it.

67.     ESDN performed all of its obligations under this agreement.

68.     As a result of KGK NY's numerous and continuing breaches of this agreement, ESDN has been damaged in an amount that cannot be precisely determined at this time, but that will be proven at trial and is known to be in the millions of dollars.

## SECOND CAUSE OF ACTION

### BREACH OF CONTRACT

#### (aGQa against KGK NY and KGK GLOBAL)

69.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

70.     As set forth above, KGK NY entered into an agreement with aGQa under which KGK NY was obligated to pay a per-card fee and to assign grades to its merchandise in good faith in exchange for the right to print and issue aGQa certification cards.

71.     aGQa performed its obligations under this agreement, and KGK NY was able to and did issue thousands of aGQa certification cards.

72.     KGK NY knowingly and intentionally "bumped" the grades that KGK NY's own affiliate, KGK Global's Hong Kong facility, had already given, resulting in the value of the jewelry being overstated by as much as double, and possibly even more.

73.     On information and belief, KGK NY sold and placed approximately $10,000,000.00 worth of fraudulently graded and priced merchandise at the 70 E-Commerce Platform jewelry store retailers, and several million dollars-worth of this fraudulently graded and priced merchandise was sold to individual retail consumers.

74.     As a result of KGK NY's fraudulent scheme, aGQa has been exposed to potential claims from its underwriter, the 70 retail jewelry stores with whom KGK NY entered into contracts concerning the E-Commerce Platform, and the retail consumers who purchased the over-graded and over-priced merchandise, and its reputation has been tarnished.

75.     As a result of KGK NY's continual breaching of this agreement, aGQa has been damaged in an amount that cannot be precisely determined at this time, but that will be proven at trial and is known to be in the millions of dollars.

## THIRD CAUSE OF ACTION

### BREACH OF CONTRACT

### (THE DIAMOND CENTER against KGK NY)

76.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

77.     The Diamond Center entered into an agreement with KGK NY under which The Diamond Center was obligated to order a certain minimum amount of diamond jewelry in exchange for KGK providing the bulk of the E-Commerce Platform and the other services associated with it, as described above.

78.     The Diamond Center performed its obligations under the agreement, and ordered and offered for sale the requisite amount of KGK jewelry.

79.     KGK NY, along with other Defendants, breached its obligations by failing to provide the support and hardware required under the parties' contract, and provided The Diamond Center with the same fraudulently graded merchandise provided to the other E-Commerce Platform retailers.

80.     As a result of these breaches of contract, The Diamond Center has been damaged in an amount that cannot be precisely determined at this time, but that will be proven at trial.

## FOURTH CAUSE OF ACTION

### FRAUD

### (aGQa and THE DIAMOND CENTER against KGK NY, KGK GLOBAL and ALLEN BLOOM)

81.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

82.     KGK NY and Allen Bloom knowingly and intentionally misled aGQa and The Diamond Center by assigning false grades to the KGK merchandise sold through the E-Commerce Platform program to the 70 jewelry store retailers, including The Diamond Center.

83.     aGQa and The Diamond Center reasonably relied on this information to their detriment, as set forth above.

84.     As a result of this fraudulent scheme, aGQa and The Diamond Center has been damaged in an amount that cannot be precisely determined at this time, but that will be proven at trial and is known to be in the millions of dollars.

### FIFTH CAUSE OF ACTION

### BREACH OF CONTRACT

### (aGQa against KGK NY and MARTIN FLYER)

85.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

86.     Martin Flyer also entered into an agreement with aGQa under which it was granted the right to print and issue aGQa certification cards in exchange for a per-card fee.

87.     Martin Flyer printed and issued many aGQa certification cards under this agreement, but has failed to pay all of the associated fees.

88.     KGK NY also failed to pay all of the associated fees.

89.     As a result of the foregoing, aGQa has been damaged in an amount believed to be approximately $72,000.00.

## SIXTH CAUSE OF ACTION

### FRAUDULENT INDUCEMENT

### (ALL PLAINTIFFS against SANJAY KHOTARI, ALLEN BLOOM, KNUD HOSTRUP, PRADEEP SAHOO, and KGK NY)

90.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

91.     The named Defendants each made repeated statements, both before and during the parties' contractual relationship, to the effect that KGK NY was competent to move forward with the E-Commerce Platform and that it intended to commit the financial and human resources necessary to see the project through, despite knowing or showing a reckless disregard for the fact that these statements were false when made, and for the purpose of inducing the Plaintiffs to commit their own resources.

92.     The Plaintiffs reasonably believed these statements to be true, in large part because KGK NY is part of a multi-billion dollar multi-national conglomerate that does billions of dollars of business in the United States.

93.     As a result of these knowingly false statements, and their reasonable reliance on them, ESDN and The Diamond Center entered into the above-described contracts with KGK NY, and all of the Plaintiffs continually poured resources into a project that KGK NY never intended to support.

94.     Because KGK NY did, in fact, abandon the project just as it was beginning to take off, the project failed and the Plaintiffs have lost millions of dollars.

## SEVENTH CAUSE OF ACTION

### DEFAMATION

### (ALL PLAINTIFFS against KGK NY, SANJAY KHOTHARI, ALLEN BLOOM, KNUD HOSTRUP, MARTIN FLYER JEWELRY LLC, JOSH KAUFMAN, and SUSAN HECHT)

95.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

96.    As set forth above, beginning in late 2011, the named Defendants engaged in a concerted effort to attempt to cover up their own failings and those of KGK NY and Martin Flyer.  The main thrust of this campaign was to intentionally spread known falsehoods about the Plaintiffs in order to pin all the blame on them.

97.    Each of the Plaintiffs has suffered individualized damage to their respective reputations.

98.    As a result, the Plaintiffs have been damaged in amounts to be proven at trial.

## EIGHTH CAUSE OF ACTION

### UNJUST ENRICHMENT AND QUANTUM MERUIT

### (ESDN against KGK NY, KGK GLOBAL, and ALLEN BLOOM)

99.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

100.    ESDN performed its obligations, as described above, in good faith, and at the request and with full knowledge of, the named defendants.

101.    The named defendants gladly accepted these goods and services, and in fact KGK NY employees worked together with ESDN and aGQa employees on a daily basis in connection with the E-Commerce Platform.

102.    ESDN had every expectation of being fully compensated therefor, in large part based on explicit statements to that effect by the named defendants.

103.    In the event that ESDN is unsuccessful on its contract claim, it is entitled to the reasonable value of the goods and services it provided to the named defendants, which is in the millions of dollars.

## NINTH CAUSE OF ACTION

### DECEPTIVE BUSINESS PRACTICES and FALSE ADVERTISING

#### (aGQa and THE DIAMOND CENTER against KGK NY, KGK GLOBAL, and ALLEN BLOOM)

104.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

105.    The named defendants' fraudulent diamond grading scheme was targeted not only at jewelry retail store owners, but also directly at individual members of the jewelry consuming public, especially insofar as it was perpetrated by creating fraudulent grading certificates that were readily available to the consuming public.

106.    While this fraud was perpetrated nationwide, it did include fraudulent diamond grades being assigned in New York to jewelry that was ultimately sold in New York.

107.    This fraudulent grading was likely to deceive customers because grading certificates are the main basis consumers use for purchasing decisions, including regarding the appropriateness of each piece of jewelry's price.  For the same reason, the fraudulent grades were material, as nothing is more central to diamond jewelry pricing and purchasing than diamond grading – once a diamond is graded, there is little to no subjectivity in pricing, as the entire industry bases its prices off the same weekly pricing list.

108.    aGQa and The Diamond Center have suffered damages in the millions of dollars in the form of potential liabilities as well as damage to their respective reputations among consumers as a result of the named defendants' fraudulent practice, and are entitled to treble damages for the named defendants' knowing and willful deceptions.

## TENTH CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH CONTRACT

### (aGQa and ESDN against SANJAY KHOTHARI, KGK JEWELRY LLC, ALLEN BLOOM, MARTIN FLYER JEWELRY LLC, KNUD HOSTRUP, JOSH KAUFMAN, SUSAN HECHT, AND PRADEEP SAHOO)

109.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

110.    aGQa and ESDN each entered into valid and enforceable agreements with the 70 jewelry store retailers that participated in the E-Commerce Platform program.

111.    The named defendants were each aware of each of these contracts, and knew of their value to aGQa and ESDN.

112.    The named defendants have, through the acts and omissions described above, each directly and intentionally undermined these contracts and business relationships, most or all of which have been cancelled, rescinded, or irreparably harmed.

113.    As a direct result, both aGQa and ESDN have been damaged in an amount that is not precisely known at this time, but is in the millions of dollars.

## ELEVENTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

### (aGQa against JOHN THORPE)

114.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

115.    As a key employee of aGQa, Thorpe owed aGQa certain fiduciary duties, including good faith and loyalty, which in turn include a duty not to interfere with aGQa's business or divert business opportunities for one's own benefit.

116.    Thorpe breached his fiduciary duty to aGQa by, among other things, diverting business opportunities with KGK NY and Allen Bloom away from aGQa and toward him for his own personal benefit.

117.    As a direct, proximate and foreseeable result of such conduct, aGQa has suffered money damages in an amount to be determined at trial, but believed to be in the millions of dollars.

### JURY DEMAND

118.    Plaintiffs hereby demand a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants as follows:

1.    Awarding Plaintiffs compensatory damages and prejudgment interest against Defendants in an amount to be determined at trial, but believed to be in the millions of dollars;

2.    Awarding Plaintiffs such statutory, exemplary or punitive damages as the Court deems just and proper to punish Defendants for their intentional misconduct;

3.      Awarding Plaintiffs their attorney fees and costs incurred in connection with this

action; and

4.      Awarding such other and further relief as the Court deems just and proper.


Dated: New York, New York
       January 22, 2013

                                   **A.E. ENGEL & ASSOCIATES, LLC**

                                   By: _____
                                        Adam E. Engel (AE-9146)

                                   1040 Avenue of the Americas – 24th Floor
                                   New York, NY  10018
                                   (212) 665-8095

                                   Attorneys for Plaintiffs